FILED
IN CLERK'S OFFICE
U.S. District Court E.D.N.Y.
1/04/2024
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DANIEL RATLIFF,                                    :

                    Petitioner,          :          **MEMORANDUM DECISION**

        - v -                            :                20-cv-1292 (DC)

MICHAEL CAPRA, Superintendent of Sing          :
Sing Correctional Facility,

                           :

                    Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:          DANIEL RATLIFF
                      *Petitioner Pro Se*
                      DIN 17A0010
                      Sing Sing Correctional Facility
                      354 Hunter Street
                      Ossining, NY 10562

                      MADELINE SINGAS, Esq.
                      District Attorney, Nassau County
                      By:    John B. Latella, Esq.
                              Assistant District Attorney
                      262 Old Country Road
                      Mineola, NY 11501
                          Attorney for Respondent

CHIN, Circuit Judge:

        On November 22, 2016, following a jury trial, petitioner Daniel Ratliff was

convicted in the Supreme Court of New York, Nassau County (O'Brien, J.), of second-

degree robbery, in violation of N.Y. Penal Law § 160.10(2)(a), second-degree assault, in

violation of N.Y. Penal Law § 120.05(6), third-degree assault, in violation of N.Y. Penal Law § 120.00(1), and second-degree unlawful imprisonment, in violation of N.Y. Penal Law § 135.05. Dkt. 4 at 9. The court sentenced Ratliff as follows: (1) fifteen years' imprisonment followed by five years of post-release supervision for the second-degree robbery conviction; (2) seven years' imprisonment followed by three years of post-release supervision for the second-degree assault conviction; and (3) one year imprisonment for each of Ratliff's two misdemeanor convictions for third-degree assault and second-degree unlawful imprisonment. *Id.* The court ordered the sentences to run concurrently and ordered Ratliff to pay $149,973.19 in restitution, among other fees. *Id.*

Ratliff's convictions were affirmed by the Appellate Division, Second Department, *People v. Ratliff*, 85 N.Y.S.3d 492 (2d Dep't 2018) ("*Ratliff I*"), and the New York Court of Appeals denied his application for leave to appeal, *People v. Ratliff*, 117 N.E.3d 825 (N.Y. 2018) (Fahey, J.) ("*Ratliff II*").

On March 6, 2020, Ratliff filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition") in this Court. Dkt. 1. Ratliff claims that: (1) there was insufficient evidence of his guilt; (2) he was deprived of a fair trial when the trial court did not qualify certain experts as witnesses; and (3) he was deprived of effective assistance of counsel. Dkt. 1 at 5-9. The Nassau County District Attorney's

Office opposed the Petition on May 29, 2020. Dkt. 4. The case was reassigned to the undersigned on December 8, 2023.

For the reasons that follow, the Petition is DENIED.

## STATEMENT OF THE CASE

I.    *The Facts*[1]

The evidence at trial established the following:

On June 10, 2014, around 1:00 p.m., Ratliff knocked on the door of Anoujj Sapra's apartment at 20 Clent Road in Great Neck, Long Island. Dkt. 4-5 at 4; Dkt. 4-10 at 8. Sapra lived alone. Dkt. 4-10 at 8. Ratliff was dressed as a flower delivery man. *Id.* When Sapra opened the door, Ratliff asked Sapra if he "was Anoujj Sapra." *Id.* When Sapra answered that he was, Ratliff tased Sapra in the chest. *Id.* Ratliff also bludgeoned Sapra in the face with "an object." *Id.* Ratliff then dragged Sapra, who had fallen to the ground, into the apartment. *Id.* Although Sapra testified to never having encountered Ratliff before, Dkt. 4-5 at 9, Ratliff apparently believed that Sapra was a marijuana dealer, and asked Sapra where the "shit" was. Dkt. 4-10 at 8. Sapra answered that the marijuana was in an ottoman, and Sapra then heard Ratliff remove the marijuana from the ottoman and place it in a bag. *Id.*

---

[1]    The facts are primarily drawn from Respondent's brief to the Appellate Division, which contains detailed citations to the record. Respondent incorporated those facts by reference in its memorandum in opposition to the Petition. *See* Dkt. 4 at 13; *see generally* Dkt. 4-10.

A thirty-minute struggle then ensued. *Id.* at 9. Ratliff hit Sapra in the face with the butt of a gun while saying that he "should kill" Sapra and "break [Sapra's] teeth." *Id.*; Dkt. 4-5 at 14. Ratliff wrapped his legs around Sapra and choked him with a rope or shoelace. Dkt. 4-10 at 9. Sapra used a piece of glass from a bowl that had broken during his struggle with Ratliff to cut Ratliff's hand. *Id.* Sapra fell unconscious as Ratliff continued to choke him and drag him across the broken glass. *Id.* After Sapra gave Ratliff the wrong combination to Sapra's hallway closet safe, Ratliff threatened to kill Sapra again. *Id.* Sapra then opened the safe for Ratliff and removed his Rolex watch from his wrist at Ratliff's command. *Id.*; Dkt. 4-5 at 19. Ratliff proceeded to hit Sapra with a dumbbell, and Sapra lost consciousness again. Dkt. 4-10 at 9. When he came to, Sapra found his hands bound behind his back with socks, and Ratliff was slashing Sapra's face and the back of his head with a piece of sharp glass. *Id.* Finally, Ratliff doused Sapra with bleach, causing an "[i]ntense burning," and ran out of the apartment. *Id.*

Sapra cut himself free and called the police. *Id.* at 10. He noticed that his "sensitive documents" -- his passport, birth certificate, and social security card -- were missing. *Id.* Sapra was also missing $2,000 in cash and miscellaneous valuable jewelry. *Id.*

Officer Daniel Cioni received a radio call about a home invasion and arrived on the scene. *Id.* EMTs, including Nicholas Pignataro, arrived shortly thereafter

4

and observed the extent of Sapra's lacerations and injuries. *Id.* The EMTs took Sapra to North Shore Hospital in Manhasset, where he gave a statement to Detective John Galowski. *Id.*; Dkt. 4-4 at 71.

After speaking with Sapra at the hospital, Detective Galowski went to Sapra's apartment with Detective Thomas Salvato. Dkt. 4-10 at 13. The home was in "disarray" and smelled strongly of "Clorox." *Id.* The officers noticed a broken glass bowl, a bouquet of flowers wrapped in cellophane, and a dumbbell strewn on the floor. *Id.* The officers recovered several items, including Sapra's bleach-stained clothing, a bloody shirt, and a pair of cut-up socks. *Id.*

Detective Galowski also secured surveillance footage from the apartment building showing Ratliff, at around 1:00 p.m., pressing the lobby buzzer while holding flowers and carrying "a distinctive backpack." *Id.* Ratliff gained access to the building and began walking through the lobby toward the stairs leading up to the apartment units. Dkt. 4-5 at 139. The footage showed Sapra entering the building and heading toward the stairs to his third-floor apartment around 1:05 p.m. *Id.* at 140. Sapra testified that as he went to ascend the stairs, he saw Ratliff and a woman he recognized as his downstairs neighbor coming down the stairs. *Id.* at 8. Because the staircase leading to his apartment was "pretty narrow," Sapra waited at the bottom of the stairs before proceeding to go up. *Id.* Next, the footage showed Ratliff reentering the lobby and holding the door open for the woman, who was exiting the building. *Id.* at 142-43.

5

Ratliff then went back upstairs toward Sapra's unit. *Id.* at 143. The footage later showed Ratliff, wearing gloves, coming down the building's stairs at around 1:46 p.m. Dkt. 4-10 at 13. Ratliff entered the building's garage, carrying a white shirt and a full backpack. *Id.* at 13-14. He discarded the white shirt prior to driving off. *Id.* at 14.

Meanwhile, at the hospital, Sapra received care from Dr. Karen Black, Chief of Neuroradiology, for level two or three trauma to his head. *Id.* at 10-11. Dr. Burt Greenberg, a plastic surgeon, also operated on Sapra for lacerations to his eye, cheek, and lip. *Id.* at 11. Sapra also suffered a broken nose and fractured cheekbone. *Id.* He spent four days in the hospital recovering from his injuries and surgeries. *Id.*

On June 27, 2014, Detective Steven Mansbart of the identification Section of the Nassau County Police Department examined fingerprint evidence from the plastic wrapping of the bouquet of flowers, a magazine of ammunition, and a bleach bottle. *Id.* at 14. He was unable to recover fingerprints from any of the objects. *Id.*

On June 28, 2014, Sapra returned to his apartment after a stay at his mother's house. *Id.* at 12. He was there to pack up his belongings and move out of the building when he discovered a gun in a shoebox in his closet. *Id.* He called the police to report the gun. *Id.* Sapra testified to not owning a gun. Dkt. 4-5 at 32. At this time, Sapra also noticed he was missing many more items: (1) a diamond and its accompanying certificate, (2) two belts valued at "over [$1,000] each," (3) an $800 pair of sunglasses, (4) and several pairs of sneakers valued at over $200 per pair. Dkt. 4-10 at

12. Sapra filed a stolen property report and submitted the list to his insurance company. *Id.* That same day, Detective Salvato returned to Sapra's apartment to secure the gun and gather more fingerprints from the shoebox in which Sapra found the gun. *Id.* at 14.

On July 16, 2014, Danielle Buthorn-O'Neill of the Nassau County Medical Examiner's Office received four fingerprint "lifts" from the front door of Sapra's apartment and one "lift" from the shoebox that Salvato had recovered. *Id.* She identified Sapra's fingerprint on the shoebox. *Id.* at 15. She excluded Sapra and Ratliff as being the source of two of the prints recovered from the door and was unable to reach a conclusion on the additional prints on the door. *Id.*; Dkt. 4-6 at 32.

Ratliff was arrested on August 14, 2014. Dkt. 4-10 at 15. Upon his arrest, Ratliff provided a buccal swab sample. Dkt. 4-6 at 97. Based on DNA profiles created for Ratliff and Sapra (who had also given a buccal swab sample, Dkt. 4-5 at 127), Christopher Chillseyzn, a forensic geneticist at the Nassau County Medical Examiner's Office, determined that Ratliff was a major contributor of DNA found on the safe, a shoebox, the magazine of ammunition, and the shirt recovered from the building's garage. Dkt. 4-10 at 15. Chillseyzn arrived at these conclusions after comparing Ratliff and Sapra's DNA profiles against seventeen other items recovered at the scene that tested positive for the presence of blood. *See* Dkt. 4-6 at 101, 103. The tests also detected Ratliff's DNA on a wall in the apartment and socks recovered from the hallway. Dkt. 4-

10 at 16.  Ratliff's blood was found in the apartment, apparently, as noted above,

because his hand was cut during the struggle with Sapra.

## II.        *The State Court Proceedings*

### a.        *The Indictment*

On September 3, 2014, Ratliff was indicted in Nassau County for three

counts of first-degree burglary, two counts of first-degree robbery, second-degree

robbery, first-degree strangulation, two counts of second-degree assault, two counts of

fourth-degree grand larceny, and second-degree unlawful imprisonment.  Dkt. 4 at 9;

Dkt. 4-9 at 5.  One count of fourth-degree grand larceny was dismissed prior to trial,

and the first-degree strangulation count was reduced to criminal obstruction of

breathing or blood circulation.  Dkt. 4-9 at 5.

### b.        *The Trial*

Trial began on March 14, 2016.  Dkt. 4-2 at 1.  The jury heard testimony

from Officer Daniel Cioni, Dkt. 4-4 at 63-81; EMT Nicholas Pignataro, *id.* at 81-99;

Detective Thomas Salvato, *id.* at 104-70; Anoujj Sapra, Dkt. 4-5 at 2-97; Detective John

Galowski, *id.* at 102-52, Dkt. 4-6 at 1-11; Detective Steven Mansbart, Dkt. 4-6 at 11-25;

Danielle Buthorn-O'Neill of the Nassau County Medical Examiner's Office, *id.* at 25-33;

Dr. Karen Black, *id.* at 37-64; Dr. Burt Greenberg, *id.* at 65-79; and Christopher

Chillseyzn of the Nassau County Medical Examiner's Office, *id.* at 85-139.  The

prosecution also presented video, DNA, and fingerprint evidence. Ratliff did not testify or put on a defense. Dkt. 4-7 at 9.

During his opening statement, Ratliff's defense counsel Christopher Cassar argued that Sapra was a marijuana dealer and a "liar." Dkt. 4-4 at 58, 62. Defense counsel claimed that on the day of the incident, Sapra had invited Ratliff over to discuss the money Ratliff owed Sapra for marijuana that Ratliff had purchased from Sapra. *Id.* at 59. Cassar also stated that Sapra had lied to the grand jury about the gun he reported finding on June 28, 2014 -- Cassar argued that the gun was Sapra's, and that this was supported by evidence showing "[Sapra's] DNA all over the grip of the gun." *Id.* at 61. Finally, during his opening and cross-examination of Sapra, defense counsel highlighted Sapra's own prior federal conviction for possession of a counterfeit check and probation violations and arrests related to drug use. *Id.* at 58, Dkt. 4-5 at 57-60. Sapra testified that, despite defense counsel's claims, he had never met Ratliff. Dkt. 4-5 at 9.

On March 30, 2016, the jury found Ratliff guilty of four counts: second-degree robbery, second-degree assault, third-degree assault, and second-degree unlawful imprisonment. Dkt. 4-7 at 184-85. The jury acquitted Ratliff of three counts of first-degree burglary, two counts of first-degree robbery, two lesser-included counts of petit larceny, criminal obstruction of breathing or blood circulation, one count of second-degree assault, and fourth-degree grand larceny. *Id.*

### c. The Sentencing Hearing

On November 22, 2016, the trial court sentenced Ratliff.  Dkt. 4-8 at 1.

First, the court considered whether, under New York Criminal Procedure Law ("CPL") §

400.15, Ratliff was a second violent felony offender for sentencing purposes.  *Id.* at 6.

The People offered Ratliff's prior June 1, 2000 conviction for burglary in urging the court

to adjudicate Ratliff as a second violent felony offender.  *Id.* at 3, 6.  On August 23, 2000,

Ratliff was sentenced under a plea arrangement to ten years' imprisonment.  *Id.* at 6.  He

served that sentence until his discharge from custody on September 19, 2008.  *Id.*  The

court found Ratliff's prior conviction "facially valid," but noted that Ratliff had

challenged the validity of his guilty plea on the ground that it was obtained in violation

of his constitutional rights -- specifically, Ratliff maintained that he received ineffective

assistance of counsel at the plea stage.  *Id.* at 7-8.

After a "careful[] review[] [of] the minutes," the trial court came to the

"inescapable conclusion" that Ratliff's 2000 plea was "not voluntary" and "not

appropriately obtained."  *Id.* at 8.  According to the trial court, it was "clear" that Ratliff

and his attorney "were completely at odds over the plea," *id.*, such that Ratliff "felt he

had no choice but to plead guilty because his attorney wasn't acting [] within his best

interests."  *Id.* at 9.  The trial court concluded that Ratliff was thus deprived of his Sixth

Amendment right to effective assistance of counsel.  *Id.* at 10.  Following that finding,

the court declined to adjudicate Ratliff a second violent felony offender for purposes of

sentencing. *Id.*

Sapra made a victim impact statement at sentencing. Dkt. 4-8 at 18-26.

The People requested that Ratliff be sentenced to fifteen years, the maximum term of

incarceration. *Id.* at 26. Ratliff's counsel requested that the court "consider a sentence of

less than the maximum." *Id.* at 27. Ratliff also spoke on his own behalf. *Id.* at 27-33.

The court sentenced Ratliff to terms of imprisonment of fifteen years followed by five

years of post-release supervision on the second-degree robbery charge; seven years

followed by three years of post-release supervision on the second-degree assault charge;

one year on the third-degree assault charge; and one year on the second-degree

unlawful imprisonment charge. *Id.* at 33-34. The court ordered the sentences to run

concurrently. *Id.* at 34. The court also ordered Ratliff to pay $149,973.19 in restitution, a

$300 mandatory surcharge, a $25 crime victims' assistance fee, and a $50 DNA fee. *Id.* at

18.

### d. *Direct Appeal*

Ratliff appealed his convictions to the Appellate Division, Second

Department, asserting the following claims: (1) the court erred in instructing the jury

with respect to second-degree assault; (2) his conviction for second-degree assault

should be vacated, as it was a concurrent inclusory count of second-degree robbery; (3)

the evidence was legally insufficient to support his convictions because Sapra was

11

incredible as a matter of law, or, in the alternative, the verdict was against the weight of

the evidence; (4) he was denied a fair trial and effective assistance of counsel because

witnesses who provided expert testimony were not qualified as such; and (5) the court

erred in refusing to submit third-degree assault as a lesser-included offense of second-

degree assault. *See generally* Dkt. 4-9 at 1-56.

On October 10, 2018, the Appellate Division ordered the judgment

modified, and, as modified, affirmed Ratliff's convictions. *See Ratliff I*, 85 N.Y.S.3d at

493. Specifically, the Appellate Division vacated the second-degree assault conviction,

vacated the sentence imposed thereon, and dismissed that count of the indictment. *Id.*

The court noted that "[t]he People correctly concede that [Ratliff's] conviction of assault

in the second degree . . . must be vacated." *Id.* at 494.

As to Ratliff's other contentions on appeal, the Appellate Division held

that (1) Ratliff failed to preserve for appellate review his challenge to the sufficiency of

the evidence because Sapra's testimony was incredible; (2) in any event, "[Sapra's]

testimony was neither internally inconsistent nor the source of all of the evidence of the

defendant's guilt," and thus, viewing the evidence in the light most favorable to the

prosecution, the evidence was legally sufficient to establish Ratliff's guilt; (3) Ratliff

failed to preserve for appellate review his contention that he was deprived a fair trial

because the court allowed expert testimony; (4) in any event, the contention was

without merit because the "witnesses' testimony concerning their qualifications and

12

experience provided a sufficient foundation for their opinion testimony"; and (5)

defense counsel's failure to preserve this issue did not constitute ineffective assistance

of counsel. *Id.* at 493-94. The court dismissed Ratliff's remaining contentions. *Id.* at 494.

On December 19, 2018, the New York Court of Appeals (Fahey, J.) denied

leave to appeal. *See Ratliff II,* 117 N.E.3d at 825.

### III.    *The Petition*

Ratliff filed this Petition on March 6, 2020, raising claims from his direct

appeal. Dkt. 1 at 5-9. Respondent filed its opposition on May 29, 2020. Dkt. 4. Ratliff

did not file a reply.

### *DISCUSSION*

### I.    *Federal Review of State Convictions*

A federal court may not grant a habeas petition on a claim that was

adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter,* 562 U.S. 86, 97-98 (2011); *Waiters v. Lee,* 857

F.3d 466, 477 (2d Cir. 2017). Hence, when a claim is adjudicated on the merits, the state

court's decision must be accorded "substantial deference." *Fischer v. Smith,* 780 F.3d 556,

560 (2d Cir. 2015) (citing *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009)).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam) (quoting *Harrington*, 562 U.S. at 102).

Moreover, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  In other words, if the state court refused to consider an argument because it was procedurally barred under state law, the argument is barred from federal habeas review so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)).  A petitioner's failure to comply with a state procedural rule qualifies as such an adequate and independent state ground, provided that (i) the state court actually "relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261-62 (1989) (internal quotation marks and citation omitted), and (ii) the state procedural rule is "firmly established and regularly followed," *James v. Kentucky*, 466 U.S. 341, 348 (1984).

14

The Second Circuit has "held repeatedly that the contemporaneous objection rule" -- that state appellate courts will review only those errors of law that are presented contemporaneously such that the trial court is "reasonably prompted" to correct them -- "is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 103-04 (2d Cir. 2011) (citations omitted). Hence, the Circuit has affirmed the denial of habeas relief based on the Appellate Division's ruling that the failure of a petitioner to object at trial rendered a claim unpreserved for appellate review. *See, e.g., Garcia v. Lewis*, 188 F.3d 71, 81-82 (2d Cir. 1999) (affirming denial of habeas relief where petitioner's trial counsel failed to bring to trial court's attention a claim that he later attempted to advance on appeal). If a claim is procedurally barred pursuant to an independent and adequate state rule, a federal habeas court may not review it on the merits, unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

## II.    *Analysis*

In his Petition, Ratliff contends that (1) the evidence at trial was legally insufficient; (2) the trial court deprived him of a fair trial by not qualifying certain witnesses as experts; and (3) trial counsel was ineffective.

I address the claims in turn.

15

### A.    *Sufficiency of the Evidence*

First, Ratliff argues that there was insufficient evidence at trial to support his conviction because Sapra provided incredible testimony. Dkt. 1 at 6. The Appellate Division considered Ratliff's claim on direct appeal and concluded that Ratliff failed to preserve his challenge for appellate review. *See Ratliff I*, 85 N.Y.S.3d at 493. The Appellate Division further noted, however, that Ratliff's contentions with respect to the sufficiency of the evidence were without merit. *See id.*

Habeas relief is thus not available to Ratliff for his sufficiency of the evidence claim. For an independent and adequate state ground to bar habeas relief, the state court rendering the judgment must "clearly and expressly" state that its judgment rests upon a state procedural bar. *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)). Here, the Appellate Division clearly and expressly stated that Ratliff's sufficiency of the evidence clause claim was unpreserved for appellate review. *Ratliff I*, 85 N.Y.S.3d at 493.

Moreover, Ratliff has failed to demonstrate that he is entitled to an exception to the procedural default rule, because he has not shown either (1) cause and actual prejudice or (2) that a fundamental miscarriage of justice would occur if the merits of the federal claim were not considered. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citations omitted); *Coleman*, 501 U.S. at 748; *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).

Ratliff's sufficiency of the evidence claim fails on the merits in any event. Defendants in a criminal trial may be convicted only upon proof establishing their guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 309 (1979). When reviewing a claim that the evidence introduced at trial was insufficient to sustain a defendant's conviction, the reviewing court applies the standard set forth in *Jackson* to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. In doing so, the court defers to the jury's assessments on both "the weight of the evidence [and] the credibility of witnesses." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). Furthermore, the court "must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)). A "petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." *Ponnapula*, 297 F.3d at 179 (internal quotation marks and citation omitted). Indeed, a federal court may overturn a state court decision rejecting a sufficiency of the evidence challenge only if the state court decision was "objectively unreasonable." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (internal quotation marks and citation omitted).

The Appellate Division held that, "[v]iewing the evidence in the light most favorable to the prosecution . . . , it was legally sufficient to establish the defendant's

17

guilt beyond a reasonable doubt." *Ratliff I*, 85 N.Y.S.3d at 493.  The Appellate Division

further determined that upon reviewing the record, "the verdict of guilt was not against

the weight of the evidence." *Id.*  The Appellate Division's determination is entitled to

substantial deference, and given the evidence presented at trial, the court's

determination was not unreasonable.

There was more than enough evidence -- including the testimony of Sapra,

corroborated by the testimony of law enforcement officers like Officer Cioni and EMT

Pignataro, surveillance footage, and medical and forensic findings -- for the jury to

conclude beyond a reasonable doubt that Ratliff attacked Sapra.  Sapra testified to the

incident in detail.  The surveillance footage showed Ratliff entering and leaving the

building, and DNA evidence showed that Ratliff was in Sapra's apartment.  The

medical evidence confirmed that Sapra was viciously attacked and seriously injured.

This compelling evidence was sufficient to support the jury's determination that Ratliff

was guilty of the charged crimes, and, thus, this claim provides no basis for federal

habeas relief.  Moreover, even assuming, as Ratliff argued at trial, that Sapra invited

Ratliff to the apartment and that the men were previously acquainted, the evidence at

trial plainly illustrates that Ratliff brutally assaulted Sapra during the encounter.

**B.**      *The Fair Trial Claim*

Nor is Ratliff entitled to habeas relief on his claim that the trial court's

admission of expert testimony by purportedly unqualified witnesses deprived him of a

fair trial. Dkt. 1 at 8. As with his sufficiency of the evidence claim, the Appellate

Division also considered Ratliff's fair trial claim on direct appeal and concluded that it,

too, was procedurally barred by CPL § 470.05(2). *Ratliff I*, 85 N.Y.S.3d at 493. Ratliff's

claim is thus procedurally barred for the reasons stated above.

The claim also fails on the merits in any event. Purported evidentiary

errors in a state court trial are rarely a basis for habeas relief. The Supreme Court has

acknowledged its "traditional reluctance to impose constitutional constraints on

ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689

(1986). As trial judges are "called upon to make dozens, sometimes hundreds, of

decisions concerning the admissibility of evidence" in any given criminal trial, "the

Constitution leaves to the judges who must make these decisions 'wide latitude'" in

ruling on the admissibility of evidence. *Id*. at 689-90 (citation omitted). Consequently,

"[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional

error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would

issue *only* where petitioner can show that the error deprived [him] of a *fundamentally fair*

trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (citations omitted). The erroneous

admission of evidence constitutes a denial of due process "only if the evidence in

question 'was sufficiently material to provide the basis for conviction or to remove a

reasonable doubt that would have existed on the record without it.'" *Johnson v. Ross*, 955

F.2d 178, 181 (2d Cir. 1992) (citation omitted).

19

Here, Ratliff cannot show that the trial court's failure to formally qualify "[d]etectives, [m]edical examiners, neurodiologists [sic] and plastic surgeons" as experts deprived him of a fundamentally fair trial. Dkt. 1 at 8. Under New York law, "[a] trial court is not required to formally declare or certify a witness to be an expert." *People v. West*, 926 N.Y.S.2d 659, 660 (2d Dep't 2011); *see also Ratliff I*, 85 N.Y.S.3d at 493-94 (collecting cases). Ratliff has not shown that any of the "experts" at trial should not have been permitted to testify. Indeed, these were the types of experts who routinely testify in criminal trials. Accordingly, for the reasons stated above, Ratliff's fair trial claim fails. Ratliff's related argument that the trial court erred in failing to "instruct the jury on the proper use of expert testimony" is also rejected. *See* Dkt. 1 at 8.

### C.    *Ineffective Assistance of Counsel*

Finally, Ratliff argues that defense counsel was ineffective for failing to preserve the fair trial issue for appeal and failing to "correct the [court's] errors." *Id.* The Appellate Division addressed and rejected the ineffective assistance claim on the merits, holding that "defense counsel's failure to preserve [the fair trial] issue did not constitute ineffective assistance of counsel." *Ratliff I*, 85 N.Y.S.3d at 494.

In general, to prevail on a claim of ineffective assistance under federal law, a petitioner must (1) show that counsel's performance was so deficient as to fall below "an objective standard of reasonableness"; and (2) establish prejudice by demonstrating a "reasonable probability" that, "but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694

(1984). In the context of a habeas petition under 28 U.S.C. § 2254, "[e]stablishing that a

state court's application of *Strickland* was unreasonable . . . is all the more difficult. The

standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . and when

the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations

omitted). Therefore, "[t]he operative question" when a federal court reviews a state

court's ineffective assistance of counsel ruling is "not whether [the] federal court

believes the state court's determination was incorrect, but rather whether that

determination was objectively unreasonable . . . ." *Waiters*, 857 F.3d at 478 (alterations

adopted) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

      The standard to establish an ineffective assistance of counsel claim under

New York law is lower than under federal law. *See People v. Honghirun*, 78 N.E.3d 804,

807 (N.Y. 2017). In New York, a defendant must show only "that counsel failed to

provide meaningful representation . . . ." *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y.

2019) (citing *People v. Stultz*, 810 N.E.2d 883 (N.Y. 2004); *People v. Baldi*, 429 N.E.2d 400

(N.Y. 1981)). Unlike the federal standard, *see Strickland*, 466 U.S. at 694, under the state

standard, the defendant is not required to demonstrate that he was prejudiced by the

ineffective assistance. *See Alvarez*, 125 N.E.3d at 120.

      Here, the Appellate Division's determination with respect to Ratliff's

ineffective assistance of counsel claim was objectively reasonable under state and

federal law.  Ratliff's ineffective assistance claim is limited to one sentence in the

Petition, where he merely states that he "received ineffective assistance from counsel

who failed to correct the [court's] errors."  Dkt. 1 at 8.  Ratliff thus plainly fails to meet

his demanding burden of showing that the Appellate Division's application of *Strickland*

was unreasonable.  Accordingly, his ineffective assistance of counsel argument must be

dismissed.

### CONCLUSION

Ratliff has failed to show any basis for relief under 28 U.S.C. § 2254.

Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of

appealability because Ratliff has not made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 1915(a)(3), I

certify that any appeal taken from this decision and order would not be taken in good

faith.

The Clerk of Court is respectfully directed to mail a copy of this

memorandum decision and the judgment to Ratliff at his last address of record.

SO ORDERED.

Dated:      New York, New York
            January 4, 2024

DENNY CHIN
United States Circuit Judge
Sitting By Designation